Good morning, Your Honors. Catherine Young from the Federal Public Defender's Office for Appellant Stevan Todorovic, and I would like to reserve about five minutes of my time for rebuttal. If the Court wishes me to focus on any specific issue, I would welcome the Court's direction. In the absence of any indication from the Court, I'd like to first turn to the 28 J letters which were filed by the prosecutor. The docket number 39 is the 28 J letter that deals with the permissive inference. And it cites two newly discovered cases, a Beltran case in 1999, a Houser case in 1997. And I just wanted to indicate that the Beltran-Garcia case was in fact cited in the opening brief, so it's not newly discovered in the context of this litigation. I wanted to make it clear that I was – I tried to be forthcoming in the opening brief as to cases that had upheld the instruction in cases that I felt were distinguishable. And the Houser case, I think along the same lines as Beltran, says that in the context of that case, the Court was going to uphold the permissive instruction, inference instruction. But the Court says it discusses all the facts of that case that found it not harmful in the context of that case, but then goes on to say, in so holding, however, we call attention to another point made, that dangers and inutility of permissive inference instructions are such that the government risks introducing error without gaining much tangible benefit, and goes on to call them unnecessary and unwise. The government also filed a 28 J letter with respect to the standard of proof regarding the loss and victim issues. And I would argue that plain error is not warranted in this case. I recognize that trial counsel did – was very concerned about the fact that there had been an injunction in a related matter that used a different standard. And as the Anders case in our brief shows, if you've got a different standard, you don't just plug it into the sentencing guidelines when you have different sentencing guidelines criteria. So I think that defense counsel's concern was unwarranted. But I think she said enough to preserve the objection, because although she says we're not stepping back from the injunction, we said, I ask the Court to recognize that is an incredibly high number that has not been proven. We do not believe the enhancement is accurate or appropriate. So I think that she did say enough to object to the enhancement, while I think unnecessarily being concerned about stepping back from the injunction. But now I'd like to turn to the first issue that I'll focus on, aside from the 28-J letters. I'd like to turn to the sophisticated means enhancement in sentencing. The sentencing guidelines provide for a two-level enhancement for sophisticated means, and it states that there – that applies where the defendant relocates a fraudulent scheme to another jurisdiction to evade law enforcement, or a substantial part of the scheme was committed from outside the United States, or it otherwise involves sophisticated means. Now, when you turn to the application note that's defining that, it says it involves especially complex or especially intricate offense conduct. And that's something I think has to be kept in mind. It must be especially complex or especially intricate to warrant this enhancement. And it says, for example, in the telemarketing scheme context, which is the context we're presenting for today, locate in the main office in one jurisdiction, soliciting operations in another jurisdiction, context such as hiding assets or transactions through the use of fictitious entities, corporate shells, or offshore financial accounts. And all the cases cited by both parties involve that kind of fictitious entities and corporate shells. We don't have that in this case. We know that Mr. Jodorowicz reported regularly to the FTC. He was straightforward about it. He didn't have multiple accounts. He didn't have multiple offices. Everything he did was totally straightforward. And our concern in this case is not only that he doesn't qualify under the terms of the enhancement, but also the probation office, the prosecutor, and the court all relied upon what we argue are completely improper bases for imposing the enhancement. Mr. Jodorowicz tried to comply with the FTC requirements. He did what they told him to do. They said you have to have a refund policy. He had a refund policy. You have to record the last portion of the phone call. He recorded the last portion of the phone call. And those are the things that the district court relied on. In fact, the district court specifically referred to recording the last part of the phone call as sophisticated. But, in fact, that's what he was told to do. And the record shows that Mr. Jodorowicz, with no high school education, struggled through high school, struggled with his teachers, became involved in the telemarketing industry. He learned a business model. He applied that business model. And then he modified the business model, as he was told to do by the FTC. First he deleted it. He changed one product for another. And then he did what the FTC told him to do in terms of recording the business, the last part of the phone call, and allowing for a refund policy to be disclosed to his customers. But everything he did was what was done in the industry, what was industry standard in the telemarketing industry. He didn't do anything unusual, because with the lack of sophistication that he had, he was only following what he had seen others do. And so, in fact, this way, there was nothing especially complex, there was nothing especially intricate about the nature of his defense. And the government find out in their answering brief that this enhancement was added to the guidelines specifically to address telemarketing scams. Now, Scrivener in dicta, and that was in dicta. Scrivener said that that was the case. But, in fact, if you looked at the legislative history that Scrivener is citing, that was not the case, because Scrivener was relying, and this was in dicta because that amendment did not apply in Scrivener. Scrivener was saying that this has been taken care of in the future by an enhancement that's not applying in this case. Scrivener says if you look at 587, and if you look at 587 and also 577, the sentencing guidelines added a separate two-level enhancement for telemarketing and redefined sophisticated means. So in this case, there was, in fact, there was in the guidelines a specific enhancement for telemarketing. It wasn't applied to Mr. Todorovic, because in the telemarketing enhancement, there are three levels. There's a two-level enhancement for mere telemarketing or ten victims. There's a four-level enhancement for 50 victims. And he got the highest enhancement, the six-level enhancement, for 250 victims. So, in other words, there was a telemarketing enhancement. Telemarketing is not the focus of sophisticated means. Sophisticated means is not intended to apply to garden variety telemarketing. It's only intended to apply where the telemarketing is especially complex or especially intricate, and it involves the type of things that are discussed in the application note, which I've already talked about. Hiding, which none exist in this case. And I think, unless there are any questions about sophisticated means, I think I've addressed all the points on that. There's also an amount of loss enhancement. Yeah, let me ask you a question about that. There was some fairly sophisticated software that was specifically designed for his telemarketing schemes by this, you know, either, at some point he appears to be a partner, then he calls himself an independent contractor, I don't remember the fellow's name, who testified, and then was impeached with the civil stuff. Who am I thinking of? I don't remember. Anyway, there was a high level of sophistication with regard to his operating procedure. And they developed all these refund policies and scripts and computer software to track it and computer software to go out and look on the internet to find all the bars so they could make the recommendations to the people who wanted to make the recommendations. And that's all fairly sophisticated, isn't it? It's specific software. He was using software that had been adapted from other telemarketing operations. Those specific modifications, which are the subject of the brief, were made to enable him to be more responsive to the customers. So that was those were specifically focused modifications to the software, which the software was just general software that was widely available. And I think, in fact, in some cases it was outdated. But the specific focus of those modifications was to enable them to be immediately responsive to customers who wanted to cancel orders. So that was not directed to concealing anything or trying to commit a fraud. He was trying to be more responsive to customers. Well, he was trying to be more responsive so the folks that he defrauded wouldn't complain to the FTC. Right? Or not? Or was his motivation to just keep giving as many refunds as he could? It's the government's. That's the government's argument that you're making. Our argument is that he really did not intend to defraud people. He was trying to do the best he could with the business model that he had been given. He's already been found guilty, so that argument goes by the wayside. I'm sorry? He's already been found guilty of fraud. But in terms of the sophisticated means enhancement, with respect to the specific argument that we're talking about, I think we can still argue his intent with respect to that software modification you're talking about. He was to comply with the FTC, not to violate the rules. Yes, Your Honor. Okay. And I see that I have about 5 minutes left, which I was hoping to reserve for rebuttal. So if there are any further questions, if not, I'll reserve the remainder of my time. Thank you. May it please the Court. Carrie Curtis-Axel for the United States. I guess we'll begin on the topic of sophisticated means where we just left off. I think that the defendant is simply wrong about the sophisticated means enhancement. I think that this Court got it right in Scribner and cited the legislative history and the commission history regarding Congress ordering the commission to add penalties for telemarketing in the TFPA. And one of those, as is expressly set forth in Amendment 587, and I'm happy to provide that amendment should the Court wish to see it, is to sophisticated means replaced sophisticated concealment. There were two changes there. One was the — well, I can't find what the first one is. But the second one was to change sophisticated means and add that to sophisticated concealment so that the application of the enhancement would no longer be limited to concealment activities, but to the execution of a scheme. And that was particularly in order to address telemarketing, as this Court said in Scribner. At minimum, it was meant to include multijurisdictional operations where either a business is done outside the country or it's based in one jurisdiction and then operates soliciting in another one. And that's, in effect, what we had here, because defendants set up a perimeter, as Larry Tompkins testified, in Santa Barbara, and then advertised throughout the country. And some of those advertising bills here were in evidence. Other marks of sophistication, as Judge Bennett pointed out, were — this was a fairly including ways for the telemarketer to take a person's zip code and pop up the city that they lived in in order to make representation that there were jobs available in those jurisdictions. And I think what the PSR focused on was actually the additional steps taken to make the misrepresentations concerning jobs seem true, such as the defendant's purchase of that database of bars, which was basically a bunch of yellow pages. And he would send those lists to victims to try to delay the period in which they still thought he had a job for them past the 30-day refund policy, at which point then he would deny them the refund. So I think that's really the basis for the application of it here. I don't think there's much to add to the 28J letters. We — I think that is sum total. We're now at seven cases that have affirmed the permissive inference instruction. I think — I apologize if that already was a referenced case. It seemed — it seemed new to us in preparation, and we missed the previous citation to it. As to loss and victims, again, in the 28J letter, we expressly quoted what the language was below. We're not making objections to the calculations in terms of the loss amount and the number of the victims. I mean, what else is the district court to do but to assume then that the argument was just one of variance, and I think it was just one of variance. I do want to take on what defense counsel has said, and this relates not just to loss and victims, but I think to other issues in the case, about trial counsel being very concerned about the injunction. And again, there's a suggestion that somehow this — the amount of loss and the amount of victims come from an injunction that is the product of a civil settlement, and that is simply not the case. That is the numbers. The defendant here kept very good business records. So those — that loss figure is based on his own financial statements, and they've never suggested that there was any other number than that's the number of his revenues net of refunds. And Todd Kossow, the FTC attorney, walked through how he came to that figure, with which defendant ultimately agreed. But it wasn't like the FTC says the number's 10 million, and he says, well, it's 2, and this is somehow a negotiated figure. It's not. This is — this is just an application of data. It's just what comes out of his financial statements and his computer databases. And I also want to point out to the Court — this is relevant, again, to the Mike Harvey issue, to the Todd Kossow issue, as well as to the loss of victims. There's no stipulation in that injunction with respect to victims. It's only loss. Victims absolutely just comes from defendants' own admissions. He filed a declaration in that action where he admitted that ABI alone, American people who purchased the product. And that doesn't include mystery shopping and whatever happened after 2003. So the victims' number comes from an admission, and it also comes from his very databases. In fact, he sponsored those very same numbers through his own expert, Brian LaRock, who he called in his case. And Brian LaRock, in fact, put in demonstrative exhibits that show 24,000 people purchased the CRG product between this period and that period. So the numbers are simply overwhelming. Any way you count them, more than 250. This is not a negotiated disposition. I'd like to touch just briefly on the evidentiary issues, if the Court has any interest. With respect to the cross-examination of defense witness Michael Harvey, that's the first one, I'd like to point out that what the brief argues, and I think is a fair interpretation of the issue that was raised to Judge Hatter, was, is it fair with this witness to get into the FTC-NIS injunction? That's the issue that's raised before Judge Hatter. There's a lot of other now talk about way in which cross-examination was done. There's even references in the reply brief to Michael Harvey's own business, Secret Shoppers Online, as additional 404B evidence. There's no objections to that. And, in fact, Secret Shoppers Online already came into evidence with Michael Harvey's partner in that business, who was Mr. Alvaro, who testified in the government's affirmative case. If Defendant Todorovic had two best buddies who he had been in business with for ten years, it was Mike Harvey and Marcus Alvaro. And they were two sides of the same coin. And they had all been in the same businesses for ten years back to the Nationwide Information Systems. And so when this issue comes up, it's really just an issue of scope and prejudice at this point. I think there wasn't a lot of discussion about whether the evidence was, in fact, 404B. It's briefly referenced in Appellant's opening brief. But on reply, Defendant does not come back and really say this was not 404B. And I think that the Court concluded it was 404B. And so we were really just talking about a 403 consideration here. And I don't know how it can be an abuse of discretion for Judge Hatter to permit that when we have in this circuit the Galey decision, the Munoz decision, and the Reed decision. And Judge Pregerson earlier today says that he tries to do the right thing. And I note that, in fact, Judge Pregerson was on the panel in the Gay case, which, of course, the government cited as a support for it's appropriate with a witness to be able to go into his particular prior frauds and impeach him with that evidence. And there were, despite the limited nine pages of that testimony, there were, in fact, a lot of inferences that arose from that testimony that you have to read the full record to really understand. Marcus Alvaro had already testified and said that the advertising, the Defendant's attempts were to be honest. And the Defendant tried to honor refunds and give refunds. The government had put on two customer service representatives, Alexis Requejo and Samantha Taylor, both of whom talked at length about refunds and said that their job was to try to bleed people out past the 30-day refund procedure. We also had testimony. Our last victim was Judy Borman, who came somewhere from the Midwest and testified that she had called the same day trying to get a refund after she realized it was a scheme. She put down the phone after ordering it and called the FTC. And then when she tried to get a refund that very same day, they said, sorry, we can't process a refund. Your package is in the mail. The only way now you can get your money back is to send the full packet in. And when she did that, they said, you can't get your $20 shipping and handling back. So she never got that back. I shouldn't say that. Some of the people actually did file with the FTC and get their $20. So I don't remember if she did or not. Some did and some didn't. But so that was the final victim that the government called. And then the defense next calls Mr. Harvey, who says, well, I modified the, you know, service person or a telemarketing sales rep who talked to the person. And so his credibility was really at stake. He had 10 years in this industry. He'd known Mr. Todorovic for 10 years. He minimized his role both at ABI and on cross-examination. He minimized what his role was at NIS. And so, therefore, it was relevant. I'd also like to point out to the Court that we made the harmlessness argument. And the defense came back and said, well, you know, there's no evidence that we would have put in the injunction, but for the cross. And I want to point out the following. If you go to defendant's closing argument and read his closing argument, you will see he had no other defense. This is not he did not claim in his closing arguments, well, really, we tried to be on the up and up. Really, we had great compliance procedures. Really, we were trying to live by telling literal truths in a way that might induce sales. What he said from the beginning of the closing argument to the end is that he didn't have an intent to defraud because of the FTC's silent acceptance. And I counted them. Twenty-five references to the FTC. Forty-three references to Todd Kossow, the FTC attorney. And they displayed all seven letters that defendants sent to the FTC as part of the compliance procedures with respect to the NIS, silent approval and silence referenced five times. And that they concluded by saying, you will see to the jury letter after letter that defendants sent to the FTC confirming his intent or lack thereof, his lack of intent to defraud. And so that really was the defense that they had here. It was inextricably bound up in the trial. And for that reason, it really is harmless on this record. Were this trial to proceed again, there's no evidence that that would not be his defense. It was his sole defense. With respect to Mr. Kossow, I have already referenced that. I want to make sure, again, here we understand the standard of review. The only objection below was to the sheer number of this, 6.1 million, 80-plus thousand victims. And that is important because Judge Hatter did sustain particular objections that were terms used. He ordered the government to redact the word victim from the trial indictment so that it wouldn't be inflammatory. And so when we say that they only objected to the sheer number, the argument was about can the number come in, and is it relevant to motive. And the Court ruled yes. This new argument about the specific language is inflammatory that was used or somehow was improper to say consent order or to reference the consent order, those particular objections were not made. And that, you know, based on the experience of Judge Hatter striking the word victim from the trial indictment, it's possible he might have been responsive to a specific language objection. So I think it's important to remember as to that it would be a plain error. What sentence did Judge Hatter impose? I believe it's 72 months. Yes. Defense counsel is confirming. 72 months, which was significantly less than the guidelines range. I thought it was less than that. Let me see if I can be of better assistance, Your Honor. 72 months. Page 4 of your brief. Thank you. And the guideline range was what? I am getting there. 188 months to 235 months. And the Court, of course, found the 18-level enhancement for loss, the victim's enhancement, and applied sophisticated means. After that, what the Court said was the guidelines don't encapsulate what this case is really about. And the duration of the sentencing proceeding then, at least as Judge Hatter's part, explaining his viewpoint, I think, went to evaluating what, you know, the aggravating and mitigating factors were. And the Court, I think, began by addressing what the defendant had asked for, which was 2 to 4 months, and said, I think it's roughly double that, but it's nowhere near 188 to 35 months. And so the Court came down substantially. Obviously, it's more than half of a deduction off of the guidelines. Thank you. Thank you. So if the Court has no further questions for me? Thank you. All right. This matter is submitted, and the Court will recess. Do we have another one? Oh, you have a new bottle? Okay. Thank you, Your Honor. I'll be very brief. I just want you to respond to a few points. Take all the time you want. Sorry. And that was that the guideline range, the Court did grant the parties, both parties agreed that there should be a downward departure in criminal history categories. So the guideline range after that was 151 to 188 months. You know, you talk so fast, the words just fly over my head. I'm sorry. I apologize, Your Honor. The guideline range after the Court revised the defendant's criminal history was down to 151 to 188 months. And I just wanted to respond to two points, one of which was Amendment 577 to the Amendment 577, page 5. The reason for the amendment is that this amendment is a two-level enhancement for mass marketing. And the Appendix C of Amendment 577, page 5, says, reason for the amendment, this amendment adds a two-level enhancement in the fraud guideline for offenses that are committed through mass marketing. So the mass marketing was separate. That was first. Second, this amendment provides an increase for fraud offenses that involve conduct such as sophisticated concealment that makes it difficult for law enforcement authorities to discover the offense or apprehend the offenders. That's with respect to the Scrivener issue and the intent of the amendment to the guidelines. And then with respect to the injunction issue, I think there was no dispute that the amount in the injunction represented the FDC's definition of gross receipts less refunds. That's not the sentencing guidelines definition. And as discussed in the Anders case, you have to apply the sentencing guidelines definition, notwithstanding that there may be a separate agreement between the parties with respect to a different definition. And under the sentencing guidelines, you have to reduce loss, it's mandatory, by money returned and fair market value of property returned and services rendered to the victim before the offense was detected. And I think those are the only issues I really wanted to respond to. If there's any further questions, I'd be happy to address them. Otherwise ---- What happened to all the money? I'm sorry, Your Honor? What happened to all the money? I think it was eaten up in the business. It wasn't a question of him living large. I think it was eaten up in the business.  Thank you. All right. That concludes this session of the Court. Recess until 9 a.m. tomorrow morning.
judges: Bennett, Pregerson, Fletcher